GILSON (FRESH v.). See Case No. 5,112.

## Case No. 5,453.

### GILTNER v. GORHAM et al.

[4 McLean, 402;[1] 6 West. Law J. 49.]

Circuit Court, D. Michigan. June Term, 1848.

SLAVERY—RECAPTURE IN FREE STATE—PAROL AUTHORITY TO AGENT TO SEIZE FUGITIVE SLAVE—LIABILITY FOR RESCUE—RESCUE BY CROWD—DISCREDITING WITNESS.

1. It is under the constitution and act of congress only, that the owner of a slave has a right to reclaim him in a state where slavery does not exist. There is no principle in the common law, in the law of nations, or of nature, which authorizes such a recaption.

[Cited in Rodney v. Illinois Cent. R. Co., 19 Ill. 44.]

2. A parol authority by the master to his agent, is sufficient to authorize a seizure of a fugitive from labor.

[Cited in U. S. v. Weld, Case No. 16,660.]

3. To make a person liable for a rescue, in such a case, he must act "knowingly and willingly." But this knowledge that the colored person is a fugitive from labor, is inferable from circumstances.

[Cited in Weimer v. Sloane, Case No. 17,363; U. S. v. Buck, Id. 14,680.]

4. To every one who mingles with the crowd, it is not necessary that the agent should state on what authority he proceeds. It is enough that he states it generally. And one of a crowd, who interposes by manual force, or by encouraging others, by words to rescue a fugitive, is responsible. But he does not make himself responsible where he endeavors to allay the excitement, and prevent a breach of the peace.

5. The agent, in seizing a fugitive from labor, acts under the sanction of law, no warrant being necessary.

6. Distinct trespassers can not be joined in the same action.

7. Where a rescue is made by the continuous action of a crowd, any one who took a part in the course of action is responsible, and may be sued with others who participated at a different time in the same action.

8. A female fugitive from labor, having had a child during her residence in a free state; on an action for her value, and the value of her husband, etc., on a charge of rescue against the defendants, the court held, as the child was not claimed in the declaration, the question whether the claimant had a right to it and a control over it, was not necessarily involved in the case.

9. A witness can not be discredited by proving that he made a certain remark, which in his examination he does not deny, but can not recollect.

10. An expression by the agent of the plaintiff, that he should not pursue the slaves, is no abandonment of his right of action.

11. A witness who stated a falsehood, which probably does not arise from mistake or misapprehension, will not be believed by the jury in other parts of his evidence unless corroborated.

At law.

Platt & Norvell, for plaintiff.
Mr. Emmons, for defendants.

McLEAN, Circuit Justice (charging jury). This action is brought to recover the value

[1] [Reported by Hon. John McLean, Circuit Justice.]

of six slaves claimed by the plaintiff, a citizen of Carroll county, Kentucky, who, having absconded from the service of the plaintiff, were arrested by his agents in the town of Marshall, in the state of Michigan, and who were by the defendants and others rescued, by reason of which their services have become lost to the plaintiff.

The second section of the fourth article of the constitution declares, that "no person held to service or labor in one state, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up, on claim of the party to whom such service or labor may be due." By the third section of the act of 1793 [1 Stat. 302], respecting fugitives from labor, it is provided, that when a person held to labor in any of the United States, and under the laws thereof, shall escape into any other of the said states, the person to whom such labor is due, his agent or attorney, may seize or arrest any such fugitive, and take him before a judicial officer, who shall require proof that the claimant is entitled to the services of the fugitive. Upon proof being made, such officer shall give a certificate, etc. And the fourth section provides, that "when any person shall knowingly and willingly obstruct or hinder such claimant, his agent or attorney, in so seizing or arresting such fugitive from labor, or shall rescue such fugitive from such claimant, when so arrested," etc., "or shall harbor or conceal such persons, after notice that he or she was a fugitive from labor as aforesaid, shall for either of said offenses forfeit and pay the sum of five hundred dollars, etc., saving, moreover, to the person claiming such labor or service, his right of action for or on account of said injuries or either of them." Were it not for these provisions in the constitution and the act of congress, every slave who escaped, by whatever means, from the state where he is held in bondage to a state or territory where slavery is not allowed by law, he would be free. There is no principle of the common law, or of the law of nations, which would authorize his recaption. To avoid this consequence, and preserve the harmony of the states, the above provisions were adopted. Where the slave absconds, the master may reclaim him. But where the slave is taken to a free state by the master, or goes there with his assent, the slave can not, within the meaning of the constitution, be said to be a fugitive from labor, and consequently the master can not reclaim him. This shows that slavery exists only by the municipal law, and that beyond the operation of such law, there is no right of reclamation in the master, except that which is expressly given to him by law: and he must pursue the mode authorized to make the remedy effectual.

There are four counts in the declaration. Two, with some variation, charge the defendants with hindering the arrest, and two charge them with having rescued the slaves after they had been arrested. Francis Troutman, a witness, states that he is the grandson of the plaintiff; that he knew the six slaves named in the declaration, and that they absconded from the service of the plaintiff, in Carroll county, Kentucky, in August, 1843. In the fall of 1846, the plaintiff having been informed that the fugitives were in Marshall, in the state of Michigan, authorized the witness to search for and arrest them, and bring them to Kentucky, calling to his aid such persons as should be necessary. December 23d following, he arrived at Marshall, and finding the slaves there, he wrote to the plaintiff to send persons who could aid him, and who could identify the slaves. After this, witness left Marshall, and did not return until the 26th of January, 1847. David Giltner, son of the plaintiff, William F. Ford, and James S. Lee, persons sent from Kentucky to his assistance, met him at Marshall, and having procured the services of Dickson, the deputy sheriff of the county, early on the morning of the 27th they proceeded to the residence of the slaves. Dickson accompanied them to keep the peace. As they approached the house, Adam Crosswhite and his son Johnson, two of the fugitives, came out of the door and proceeded in different directions, apparently with the intention to escape. They were followed, and on being requested, returned to the house. The witness entered the house, and told the family he had come as the agent of Giltner to arrest them as his slaves, and to take them before 'Squire Sherman to prove that they belonged to the plaintiff. On this, Adam attempted to leave the house, but witness prevented him. The witness requested the family to get ready to go before the magistrate. Some preparation was made, when Adam inquired if they were to be taken off without a trial. Witness informed him they should have a fair trial, and the best counsel he could procure. Adam said the weather was cold, and that the family could not walk to the house of the justice. Witness replied, that a wagon should be procured to convey them. The witness permitted Adam to consult counsel, and he went to another part of the village, accompanied by Dickson, for that purpose. Witness remained in the house with the family. Before Adam's return, several colored persons and some white ones came to the house. Planter Morse, a colored person, and one of the defendants, entering the house, declared the family should not be taken. He was much excited, and pulling off his coat, declared he would go into the fight. He advised Adam, on his return, not to be taken, declaring that he and others would stand by him, and drive off the kidnappers. Adam then went to a drawer, took out of it something which witness supposed to be a knife and powder-horn. Morse drew a knife, and using it in a menacing manner,

declared what he would do with it, if witness attempted to take the family away.

About this time five other persons came to the house, one white man and a boy, the others colored. Hacket, one of the colored men, came near to the witness, who was standing in the door, and inquired what he was doing. Witness replied that he was doing what the law authorized him to do. Hacket said he would see about that, and attempted to pass into the house. Witness told him to stand back. Hacket's hand was in his pocket. Witness again told him to stand back, drawing a pistol which he retained in his hand, but did not present it in a firing attitude. Hacket retired, saying he would attend to witness. James Smith, a colored man, and one of the defendants, approached, and in an excited manner inquired where the Kentuckians were, who were attempting to kidnap the Crosswhite family. The witness was pointed out to him, and Smith, with a club raised, approached within five or six feet of witness, when he was seized by Dickson, who, with the aid of one or two other persons, led him away. Smith, as he approached witness, threatened to smash out his brains. Charles Berger, a colored man, and a defendant, approached, and in an excited manner inquired where the Kentuckians were, and, as witness thinks, drew a knife, the handle of which he saw, and which he used in a threatening manner. Dickson interfered and led him aside, though he still remained on the ground. William Parker, a colored man, and also a defendant, came up with a gun, and declared he would risk his life to prevent the Crosswhite family from being taken. By this time one hundred or more persons, white and black, had collected. Threats against the lives of the Kentuckians were made, if they persisted in taking the fugitives. They were denounced as kidnappers, and some proposed to tar and feather them—others to massacre them. About this time Charles T. Gorham, Herd and Combstock, defendants, came on the ground, with Easterly, at first made defendant, but as to whom the suit is now discontinued. This was about eight o'clock in the morning. A large crowd had assembled, who uttered a good deal of menace. The whites encouraged the blacks. Easterly said something, when Gorham said to the witness, "You have come here after some of our citizens." Witness replied that he had come as agent of Giltner, the owner of the slaves, to take them before a justice, with the view to establish the right of the plaintiff to their services. Gorham replied, "You can't have them, or take them: this is a free country, and these are free persons." Either at his suggestion or the suggestion of the witness, they walked aside, when Gorham advised witness not to take the negroes, and demanded his authority. Witness stated it, and Gorham then remarked, "There is a great deal of danger in making the attempt

to take them;" and added, "We will not allow them to be taken." At this time the wagon to convey the family was driven near the house, when witness, after again stating his authority, declared he would take the fugitives before the justice. Combstock, one of the defendants, then said, "You can not have the negroes." Witness, looking him full in the face, inquired why they could not take them. Combstock, pointing to the crowd, said, "You see that in making the attempt your lives will be endangered;" and added, "You can't have them, or can't take them, by moral, physical, or legal force; and you might as well know it first as last, and the quicker you leave the ground, the better for you."

Gorham took up the remark of Combstock, a short time after it was made, and offered the following resolution: "Resolved, that these Kentuckians shall not take the Crosswhite family by virtue of moral, physical, or legal force." This was passed by general acclamation, and with much noise. Witness then said, taking a book from his pocket, that he wanted the names of all responsible persons who intended to prevent him from taking the slaves. Gorham said he came there by public sentiment, to prevent his taking the slaves; that public sentiment was above the law; that similar attempts had proved abortive; and we will not permit our citizens to be kidnapped and taken back to slavery. This was before he offered the above resolution. When witness called for names, he addressed himself to Gorham and Easterly. They both gave their names, and Gorham requested that his name might be put down in capitals; and he requested witness to bear it back to the land of slavery as a moral lesson; and he added, that he wanted to make an example of witness. Combstock also gave his name in full, Oliver Cromwell Combstock, Jun., adding the Junior, he said, that his father might not be held responsible for his acts. These three were the only names taken by witness. Gorham said he was responsible, and Combstock requested witness to inquire of his neighbors as to his responsibility. Witness, standing in front of the house, requested Dickson to summon Gorham, Combstock, and others, to assist in keeping the peace, while he should seize the negroes to take them before the justice. Some of the slaves were in the house, others among the crowd. Dickson, and the friends of witness, seemed to think that nothing more could be done. After Gorham's resolution, as witness thinks, he asked the privilege to offer a resolution: "Resolved, that I, as agent of Francis Giltner, of Carroll county, Kentucky, be permitted peaceably to take the family of Crosswhite before Sherman, a justice, that I may make proof of property in the slaves, and take them to Kentucky." Witness heard no votes for the resolution, at least not more than one or two. Witness then proposed that if

they would permit him to take the slaves before the magistrate, and if he should prove the right of the plaintiff to their services, and obtain the certificate, he would give them time to raise money to pay for the slaves a reasonable price; and he proposed to contribute more than any other man. Gorham replied, "You can't have a sixpence for them, and you can't take them." Again witness requested Dickson to summon the above persons to assist in keeping the peace. Gorham then said, "Hold on, and we will see whether we will let you take them to the magistrate's office." Gorham, Herd, and Easterly seemed to be in consultation a short time. When it was ended, Herd, standing outside of the gate, in the presence of Gorham, a few rods in front of the house, offered the following resolution: "Resolved, that these Kentuckians leave town in two hours." Here some one of the crowd added, "Or they shall be tarred and feathered, and rode on a rail"—when Herd continued, "Or they shall be prosecuted for kidnapping or housebreaking." Prior to this, witness had been arrested on a warrant on complaint of Hacket, but was permitted by Dickson, who served the warrant, to remain on the ground. A warrant was made out by witness, and signed by Sherman, to arrest the slaves, which was placed in the hands of Dickson. This was done to prevent resistance. But Dickson refused to execute the warrant. He served the warrant on the witness, issued on the oath of Hacket, and being advised by Dickson and others that he could not, by reason of the crowd, take the negroes before the justice, and that it would not be safe to attempt to do so, he desisted. Before witness left the ground, Dickson several times declared that he must take him before the justice, as commanded by the warrant. A second process was issued against him for a trespass in breaking the fastening of Adant's door. After breakfast, witness was taken before 'Squire Hobart and went into trial on the trespass case, which continued until 9 or 10 o'clock in the evening, and was then adjourned until next morning. Gorham was present next morning, and observed to witness, "Your negroes are gone." Witness replied, that he had been told so, and observed he would give one hundred dollars if they were in the town. Gorham replied, "If you will say two hundred dollars we will have them brought back." He said that he would not place the negroes in the possession of the witness, but would return them to their house, and no white man should interfere. Witness refused to enter into the proposed agreement. A judgment of one hundred dollars damages and costs, was entered against the witness by the justice in the trespass case. On the morning of the 29th, as witness and his Kentucky friends were about leaving, at the National Hotel, in Marshall, Herd, Gorham, and others being present, witness said to Gorham, "You have

all got the advantage of me now," but he could not tell how it would end. Gorham said, "Yes, the negroes are gone, and you can never get them." The witness estimates the value of the negroes at two thousand seven hundred and fifty-two dollars.

Harvey W. Dickson states, that he was deputy sheriff, and was requested by Troutman to accompany him in arresting the slaves to keep the peace. On entering the house of the negroes, Troutman explained to them that he had come as the agent of Giltner to take them before a magistrate, to prove property, and then take them to Kentucky. Crosswhite consented to go—told the family to get ready—put a cloak round his little girl—said that it was cold, and that he did not wish to go without a wagon. Troutman said a wagon should be procured. Afterward witness's attention was called by Troutman to the fact that Adam was arming himself. Morse was there at this time. Troutman prevented Adam from going into the cellar. Witness next observed Hacket, a white man and a boy—heard Hacket ask Troutman what was going on. Troutman replied that he had business there, etc. Hacked attempted to come into the house. Troutman, standing in the door, forbade him; but he continued to approach until Troutman drew something out of his pocket, which witness supposed to be a pistol; and Hacket turned about and went off. Smith came up with a club, and inquired where that kidnapper was who had drawn a pistol on Hacket—was shown Troutman—approached him with his club, but was stopped by witness and led away. Witness then saw Berger approach with a stone, that would weigh from four to six pounds, and said he would smash Troutman. About this time witness went to town with Adam, to consult about his case, and returned in half an hour. When he returned, there were from one hundred to one hundred and fifty persons collected—heard Troutman call for responsible names. Gorham requested him to "put down his name in capitals, and bear it back to the land of slavery, as an evidence of the example we intend to make of you." Witness refused to execute the warrant to arrest the negroes, handed to him by Troutman. He should have attempted to execute it with great reluctance, by reason of the excitement. On being requested, Troutman stated to Gorham, that he acted as the agent of Giltner, who owned the negroes, under the act of 1793. Gorham said they did not care about an act of congress: "The dear people are the law, and you can't have the negroes." Witness, at the request of Troutman, summoned Gorham, Herd, and others to assist in keeping the peace. Comstock asked witness for his warrant, before or after he gave his name in full to Troutman. Gorham offerred the following resolution: "Resolved, that we will not permit these Kentuckians to take the slaves, by moral, physical or le-

gal force." The ayes were called for, and the resolution passed with one or two dissenting voices. Troutman then offered the resolution as stated by him, which was unanimously rejected. Witness did not see Combstock on the ground at this time. Herd, one of the defendants, then offered a resolution: "Resolved, that these Kentucky gentlemen, if such they may be called, leave here in two hours, or we will take them with a warrant for trespass or housebreaking." Some one added, "Or we will tar and feather them, and ride them on a rail." Troutman then offered a resolution: "Resolved, that we adjourn to meet at two o'clock," observing, "and you will find me on the ground." Shortly after this the crowd dispersed. Before leaving the ground, a warrant was put into the hands of witness, by Hacket, against Troutman, charging him with an assault and battery with intent to kill. Witness must have had this warrant two or three hours before the adjournment, during which time Troutman considered himself in the custody of the witness; and as an excitement was getting up against witness for not executing the warrant, he stated the fact to Troutman, and told him that he must go before the justice. Troutman remained in the custody of the witness until the next day. Witness heard Troutman say the next day, that he would give one hundred dollars if the negroes were in the village. Gorham observed, "If you will give us two hundred dollars, we will bring them back—not to deliver them to you—but we will put them in the house they occupied, and every white man shall keep away; and then if you can take them, you shall have them." Before the first visit to the house of the fugitives, witness called there as a tax collector, to take an assessment of property, persons, etc., his object being to ascertain whether the family were there.

Charles W. Lusk was on the ground at about eight o'clock. There might have been fifty, sixty, or one hundred persons present, among whom were from fifteen to twenty colored persons. There was great excitement. Smith, one of the defendants, a colored man, had a club in his hand, and said he intended to welt some of the Kentuckians. Witness entered the house a few minutes—saw in it Adam, his wife, and several of the children. There were some white persons in the house. When he came out of the house, he observed the crowd had increased. Every one seemed to take an interest in the Crosswhite family, and it was said in the crowd that the Kentuckians would be sorry enough for their efforts. Witness saw Gorham, Combstock, and the other defendants in the crowd. Troutman stated his authority to the crowd, and that he wished to take the negroes before Justice Sherman, to prove them to be the property of Giltner. In other matters, the witness corroborated the statements of Troutman. Twelve other witnesses corroborated the statements of Troutman in several particulars.

David Giltner, the son of the plaintiff, identified the fugitives, and stated that they belonged to his father. At the request of his father, he came to assist Troutman, and was accompanied by Ford and Lee. These men, his father informed him, were employed to assist, and would meet him at a certain place. At that place the witness met them, and they accompanied him, as they had agreed with his father, the witness paying their expenses with money advanced by his father for that purpose. Being in the crowd at Marshall, and hearing the threats made against Troutman and the Kentuckians generally, the witness said if there was to be an attack on any person, he hoped it would be on him, as he was most interested in recapturing the slaves; and he also remarked, if by force they should be prevented from taking the negroes, that he would bring a regiment from Kentucky, and would take them.

The evidence of the plaintiff being closed, witnesses were called by the defendants.

Henry Halsey—For ten years has been a citizen of Marshall. At about a quarter before nine o'clock in the morning he rode up to the ground, passing Gorham on the way. When he arrived, Troutman was talking loudly with the crowd. As Gorham approached, Troutman stepped a little out of the crowd, and met him. Gorham inquired, "What are you doing here?" Troutman replied that he had come there to take the slaves, but had been interrupted—said they belonged to Francis Giltner, of Kentucky, etc. Gorham said, "You can't take them." Troutman inquired, "What is your name, sir?" Gorham replied, "Charles T. Gorham." Troutman commenced writing it, and inquired of Gorham if he were responsible for what he said. Gorham, or some one, answered in the affirmative, and he requested Troutman to write it in capitals. After writing it, Troutman asked, "Do you say that I shall not take the slaves away?" Gorham replied, "No; I said no such thing. You see the manifestation of the people, and it is impossible for you to take them." Gorham inquired, "By what authority do you act?" Troutman replied, "By the authority of the constitution and the act of 1793." Troutman asserted that he had rights there, and the people had prevented him from carrying them into effect. Gorham replied, "You see that the people have taken the law into their own hands. They consider the negroes as citizens. There was an excitement in the crowd, to impress any one with the apprehension of danger." Gorham did not seem to be excited—he treated Troutman politely. Gorham said this was not a mob: it is composed of men of character. Witness saw Combstock talking with Troutman near the house. Combstock asked Troutman for his authority. Troutman said he did not need any

authority." "Then," said Combstock, "you can't take the family away." Troutman inquired, "What is your name, sir?" Combstock replied, "Oliver Cromwell Combstock, Jun. Give it or write it in full." After writing it, Troutman observed, "You say that I shall not take this family away." Combstock answered, "I beg your pardon; I did not say so, or use that language. I said you must see that you can not take them away, from the excitement which exists, by moral, physical, or legal force." And he remarked, "This is not an abolition mob." The excitement was great. The witness says Troutman offered the first resolution. At this time, the excitement had measurably subsided, and the people were talking and laughing. Many had left the ground. The excitement abated when it was understood the negroes would not be taken away. Troutman's resolution was, "Resolved, as peaceable citizens, we will abide by the constitution and laws, and will permit the slaves to be taken before Justice Sherman," etc. Witness and a few others voted for the resolution, all the others against it. Gorham, witness says, offered an amendment to the resolution—"provided they do it legally." There was no vote, he thinks, on this amendment. Herd then offered the following resolution: "Resolved, that these Kentucky gentlemen be requested to leave town in two hours." Some one here proposed—"or be tarred and feathered." Herd expressed his disapprobation of this, and added, "or be prosecuted for breaking into the house of a peaceable citizen." Troutman then offered a resolution to adjourn until 2 o'clock, and added, "You will find me on the ground." Gorham disapproved of the amendment offered to Herd's resolution, and remarked it was unbecoming. The larger portion of the crowd at that time had dispersed. The witness thinks from one fourth to one third only remained on the ground. There seemed to be very little excitement at the time of the adjournment. The witness is brother-in-law of Dr. Combstock.

Asa B. Cook. Witness was on the ground at half after 8, at which time there were present six or seven white persons and eight or nine negroes. Troutman, Giltner, and the other Kentuckians were on the ground. He heard Giltner say, "If they shall refuse to let us take the slaves, we will bring a regiment from Kentucky and take them." Hearing a conversation between Troutman and Gorham, he approached them. Troutman said, "I understand you to say that I shall not take the slaves." Gorham replied, he had not said so, but he supposed Troutman would be satisfied from the crowd that he could not take them. Gorham said they were not abolitionists—advised Troutman not to make an attempt to take the fugitives, as it would cause great excitement. Gorham evinced earnestness, but he was good natured. In one or two instances, Gorham exert-

ed himself to allay the excitement. Dickson called on witness, Gorham, and others to assist in taking the slaves. He had a warrant, but after this he made no attempt to take them. Combstock asked Troutman what he was going to do. He replied that he was going to take the slaves. Combstock replied, "It is evident from the excitement you can not take them." Troutman asked Combstock for his name. He gave it. Troutman said he did not want the slaves, if he could get names who were responsible. Troutman then said, "I understand you to say we shall not take the slaves." Combstock replied, that he had not said so, but remarked, "You ought to know from the appearance here that you can not take them by moral, physical, or legal force." Soon after this, witness left the ground with Combstock. He heard no resolution offered. There must have been about one hundred and fifty persons on the ground. In the course of his examination, this witness to impeach Dickson was asked, "whether Dickson did not admit to him that he might have called Gorham and others to assist in taking the negroes?" In his examination, Dickson said he had no recollection of having done so. But the court refused to permit the question to be asked, as it did not contradict the witness Dickson. His statement of a want of recollection, is not a ground to discredit the fact of recollection not being ascertainable.

Twenty-four witnesses were examined, who corroborated, more or less, the facts and circumstances stated by the two preceding witnesses.

From the facts proved, there seems to be no doubt of the right of the plaintiff to the services of the fugitives. Giltner identifies them as the slaves of his father, and Troutman does the same. And there is nothing in the evidence or in the circumstances of the case, which casts the least doubt on this right. The agency of Troutman and those associated with him, seems also to be established. It is proved by Troutman and by Giltner. The former was authorized to call to his assistance such persons as he should deem necessary, and those who acted with him were so called. And in addition to this, the plaintiff sent his son, and Messrs. Ford and Lee, to assist him. This is as clear a proof of agency as could be expected in any case. In the case of Driskill v. Parish [Case No. 4,089], doubts were suggested whether such an agency could be constituted by parol. But that was a case where a written power was given, and it was not produced on the trial. We suppose that a parol power must be held to be sufficient. This is a common law principle, and the statute, which authorizes the agency, does not require it to be in writing.

From the witnesses of the defendants, as well as those of the plaintiff, there would seem to be no doubt Troutman arrested the fugitives, and that they were rescued from

his possession and control. When he entered the house and communicated to Adam and his family that he came as the agent of Giltner to take them before a justice, to prove the service they owed, and to take them back to Kentucky, Adam yielded, and considered himself and family under his control. He left his family in the house with Troutman and others, and went into the village, under the care of Dickson, to take counsel. It was not until after the crowd assembled, became excited and showed a determination to resist the claim of the agent of Giltner, that Adam and his family saw a prospect of escape. Indeed the counsel for the defendants admit there was a rescue, and that it was not in the power of Troutman and his assistants, to take the fugitives before the justice. The rescue of the slaves enabled them to escape to Canada, beyond the reach of the claimant. As there was an arrest, the jury can disregard the two counts in the declaration for hindering an arrest. If they shall find for the plaintiff, it will be under the two counts for a rescue. The rescue is not only clearly proved, but admitted, consequently only two questions remain for the decision of the jury. Are the defendants guilty? and if guilty, what amount of damage is the plaintiff entitled to?

There is, as might be expected, a great difference among the witnesses as to the number of the crowd. It was hastily collected, under circumstances of great excitement. The estimate of the witnesses varies from one hundred and fifty to two hundred and fifty. Some of them suppose there might have been three hundred. Now to subject any one of that crowd to an action for the rescue of the slaves, it is not necessary to show that he used manual force, or conveyed the fugitives beyond the power of the claimants. Being present in the crowd, if by words or actions he encouraged others to make the rescue, he is responsible. It may be that the respectable persons which formed that assemblage acted under a mistaken view of the law, but this constitutes no justification or excuse. The injury of the plaintiff is the same, whether the acts complained of were done by a good motive or a bad one. The actors proceeded on their own responsibility, and they cannot now escape from it. Such assemblages are dangerous to the public peace and to private rights. Impelled to action by the most reckless, the crowd lose sight of individual responsibility, and are led to commit atrocities from which, as individuals, they would shrink with horror. Hence the danger of commingling with such a crowd, except as peace-makers and to prevent mischief. From the evidence it seems that many of the most orderly and respectable citizens of Marshall were found at the house of Crosswhite. And so far as they may have been induced to go, to protect the rights of the colored persons in question from an illegal seizure, their mo-

tive is not to be condemned. But when they were informed, by the principal agent, Troutman, that the seizure of the negroes was only for the purpose of taking them before a justice, to prove that they owed service to Giltner, there was no excuse for opposition founded in law or in conscience. That man is a dangerous citizen, who follows his conscience in violation of the legal rights of others. Troutman, as the agent of the plaintiff, was in pursuit of a legal right —a right sanctioned by the fundamental law of the Union—and his conduct under the emergencies was characterized by forbearance and a respect for the law. He was armed, but, as it seems, only for self-defense.

There are seven defendants, and the jury will apply the evidence to each. It is insisted that the jury can not find a general verdict of guilty against all the defendants, unless they all participated in the same act at the same time. That those who may have done acts which made them responsible at the first assemblage of the crowd, can not be connected with others, who subsequently did other acts which make them responsible. Distinct trespasses, it is admitted, can not be joined in the same action. But such is not the case under consideration. The act was continuous. The declaration charges a rescue, and that was accomplished by the crowd, in a course of proceeding of more than three hours. Threats were used, weapons were brandished by certain colored individuals, resolutions were passed, evincing a final determination by the crowd not to suffer the fugitives to be taken before the justice. Now, it may not be possible to point out any particular act, standing alone, which effected the rescue; but when we look at the course of action, we see that it was done. In this respect the acts of the multitude are inseparable, and responsibility attaches to each individual who participated.

Planter Morse, one of the defendants, entered the house of Crosswhite not long after Troutman entered it, and in a most violent and excited manner, declared that he would oppose the taking of Adam and his family; and he advised them not to be taken, and gave an assurance that he and others would stand by them. This, if you believe the witnesses, identifies this defendant with the rescue. A question is made whether this and some of the other defendants had notice that Adam and his family were fugitives from labor. The words of the act are, when any person shall "knowingly and wilfully" hinder an arrest of the fugitives, or rescue them after they shall have been arrested. In the case of Driskill v. Parish [Case No. 4,089], it was held, "that no one incurs the penalty under the act of congress, for 'hindering or obstructing an arrest,' who does not act 'knowingly.'" And the same principle applies in the case of a rescue. To bring an individual within the statute, he

must have knowledge that the colored persons are fugitives from labor, or he must act under such circumstances as show that he might have had such knowledge, by exercising ordinary prudence. Morse is not proved to have been present when Troutman communicated to Adam and his family, that he came to claim them as the agent of Giltner. He came, it is believed, shortly after this announcement was made; and of which he might have been informed had he inquired of the inmates of the house, or of those who were at that time present. In a free state, every human being is presumed to be free, without regard to color, until the contrary is proved. The presumption is said to be against the freedom of a colored person in a slave state. These were circumstances sufficient to put Morse upon the inquiry whether Adam and his family were not fugitives from labor. And the same remark applies to the other defendants. It was not necessary for Troutman, on the approach of every individual, to proclaim his authority and object. It was enough that he stated them once, and more than once, to the crowd.

Charles Bergen, another of the defendants, approached Troutman, drew his knife, and used it in a menacing manner, until he was led aside by Dickson. And William Parker, also a defendant, came to the crowd with a gun, and declared he would risk his life to prevent the Crosswhite family from being taken. James Smith, also a defendant, coming into the crowd, inquired where the Kentuckians were who were attempting to kidnap the Crosswhite family. Troutman being pointed out to him, he approached within six feet of him, raising a club, when he was seized by Dickson, who, with the aid of one or two others, led him away. None of the witnesses, it is believed, state anything which contradicts these facts, and, if the jury believe them, they would seem to be conclusive as to the guilt of the above defendants.

In regard to the defendants Gorham and Combstock, there is some contrariety in the evidence. This difference exists in regard to certain facts, and as to the order of time at which they occurred. From the statement of Troutman, and several other witnesses who corroborate him, it would seem that Combstock first declared "the slaves could not be taken by moral, physical, or legal force;" and that shortly afterward, Gorham adopted the same sentiment, which he offered to the crowd in form of a resolution, that was passed by acclamation. Gorham is also represented as saying that public sentiment was above the law, and that the people had taken the law into their own hands, and that he came there in obedience to public sentiment, to prevent the slaves from being taken. These statements were made by some six or eight of the plaintiff's witnesses. A still greater number of the defendants' wit-

nesses represent the facts somewhat differently. They say that Troutman opposed the first resolution, and that no resolution was offered by Gorham. Some of the witnesses say that to Troutman's resolution, "that he might be permitted to take the slaves," Gorham offered an amendment, "if he shall take them legally." The resolution said to have been offered by Gorham, identified him with the illegal movement; but if he offered no resolution, and merely proposed the amendment to Troutman's resolution, as above stated, that act, disconnected with others, did not implicate him. And in regard to the declaration of Comstock, that "you can't take the slaves by 'moral, physical, or legal force,'" many of the defendants' witnesses say, it was a remark made wholly in reference to the public feeling, and not as a wish or determination of the defendant to prevent such a taking. On the contrary, it is said, that he referred to the excitement of the crowd, and its expressed determination, not to permit the slaves to be taken; and that his motive was, manifestly, to preserve the peace, and prevent blood-shed. It appears Combstock arrived on the ground somewhat late, and remained only a short time. That the facts which transpired in an excited crowd, should be differently related by different witnesses, was to be expected. Differences, under such circumstances, do not necessarily authorize an imputation against the motives of the witnesses. The confusion and excitement of the crowd, must have prevented witnesses from hearing distinctly and comprehending the movements of persons most actively engaged. It is proper that I should say of Troutman, the leading witness for the plaintiff, that considering the circumstances under which he was placed, he bore himself with moderation and excellent temper. To the taunts and abuse which were thrown out against him and his associates, by inconsiderate individuals in the crowd, he made no reply, but sustained himself with a manly firmness.

The credibility of witnesses rests with the jury. You will decide where witnesses differ, which is entitled to belief. It will be your duty to reconcile statements which seem to be contradictory, if they can be reconciled. The manner and bearing of witnesses in their examination, are entitled to great consideration where there is a conflict. If from the whole evidence it shall appear that Gorham and Combstock, and Herd, the other defendant, went upon the ground with the view to preserve the peace, and they nor either of them while on the ground said nor did anything to excite the crowd to oppose the seizure of the fugitives for the purpose avowed; and especially if the tendency of their acts was to allay the excitement without encouraging the rescue of the fugitives, they are not guilty as charged in the declaration. But, on the contrary, if their conduct on the ground had a different

tendency, if they said or did anything by resolutions or otherwise to encourage the crowd in their illegal acts, the defendants are guilty. Of this, gentlemen, you are the exclusive judges. The respectability and high moral bearing of these defendants, will not in the least excuse an illegal act, which is injurious to any one.

It seems that since the residence of the fugitives at Marshall, a child was born by the wife of Adam, and the court are requested to instruct the jury that the plaintiff had no right to the child, or through his agents to take it to Kentucky. Nothing is claimed for this child in the pleadings, and no question in regard to it is necessarily involved in the case. In this action, as in every other where damages are claimed for a wrong done, the wrong must be clearly proved—so proved as to satisfy the minds of the jury.

We are requested to say to the jury, if a witness swear falsely in one particular, he is not to be believed in any. This must depend on the nature of his relation. Should the jury believe that a witness swears falsely, deliberately and corruptly, they may and should place little or no confidence in any other part of his evidence, which is uncorroborated by other witnesses. But if the misstatement is the probable result of mistake or misapprehension, the jury will not regard it further than as showing an inaccuracy of memory or judgment. The jury, therefore, in weighing the evidence, will judge of it under all the circumstances connected with it. The belief of a witness, resting upon facts within his own knowledge, is evidence; but his belief is not evidence where it rests upon facts not within his knowledge. The direct pecuniary interest of a witness in a case, however small, renders him incompetent; and any other connection of agency or relationship to a party, may go to his credibility.

In this action, the plaintiff claims the value of the slaves in damages. For a rescue, as also for hinderance on arrest of fugitives from labor, and for harboring or concealing them, the act of congress gives a penalty of five hundred dollars; but, beyond this, the statute saves to the party injured an action for damages. Under this provision this action has been brought; and if the jury shall believe that the defendants, or any part of them, aided and assisted in the rescue, as before stated, the jury will find the whole of the defendants, or a part of them guilty, as the facts may authorize. There can be no doubt, that by reason of the rescue, the fugitives escaped to Canada. The value of their services, which has been proved by two or three witnesses, with little variations in their estimates, is the loss which the plaintiff has sustained. Any expressions of Troutman, that he should not pursue the fugitives, does not show a relinquishment of this right of action. It seems to have been an expression of abandonment of the claim, imposed upon him by a necessity which he could not control.

This, gentlemen, is an important case. It involves great principles, on which in a great degree depend the harmony of the states, and the prosperity of our common country. The case has acquired great notoriety by the action of the Kentucky legislature, and of the senate of the United States. It is the first one of the kind which has been prosecuted in this state.

The defendants' counsel, to some extent, have discussed the abstract principle of slavery. It is not the province of this court, or of this jury, to deal with abstractions of any kind. With the policy of the local laws of the states, we have nothing to do. However unjust and impolitic slavery may be, yet the people of Kentucky, in their sovereign capacity, have adopted it. And you are sworn to decide this case according to law—the law of Kentucky as to slavery, and the provisions of the constitution, and the act of congress in regard to the reclamation of fugitives from labor. This provision of the constitution is a guaranty to the slave states, that no act should be done by the free states to discharge from service in any other state, any one who might escape therefrom, but that such fugitive should be delivered up on claim being made. This clause was deemed so important, that, as a matter of history, we know the constitution could not have been adopted without it. As a part of that instrument, it is as binding upon courts and juries as any other part of it.

The chief excellence of our institutions consists, not so much in our written constitutions and laws, as in the moral power which they embody. Intelligent foreigners are more forcibly struck with this great fact than with any other. They see no military array—no display of martial music, or men-at-arms, to attract and intimidate; and they inquire, where is the government? It is neither to be seen nor felt, and yet the people are quiet and orderly. Foreigners seem to have no adequate conception of that moral power which unseen pervades every part of our country. Under its aegis our citizens repose in confidence, as to the safety of their persons and property. If injured in either, they look for redress to an energetic and enlightened execution of the laws. And from this does moral power emanate. Laws the most wise and wholesome, if not carried into effect, can be productive of no good. They will remain on our statute books as monuments of reproach. If we wish to give permanancy to our government, and preserve its great principles, we must stand by the constitution and laws; and in the administration of justice, especially, we must give effect to them. In the law is found the only safe rule by which controversies between man and man can be decided. In no supposable case, has a juror a right to substitute his own views, and disregard established principles

of law. A well instructed conscience is a proper guide for individual action; but when we are called upon to act upon the interests of others, we violate our oaths, and show ourselves unworthy of so important a trust, when we adopt, as a rule of action, our own convictions of what the law should be, rather than what it is.

The jury, after being out all night, returned at the opening of the court the next morning, and declared they could not agree, and they were discharged.

At the succeeding term a verdict was given for the plaintiff for the value of the slaves. Judgment.